PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ARCADIO COLÓN, Defendant and Appellant.

No. 6027. Argued November 18, 1936.—Decided December 16, 1937.

*Felipe Colón Díaz* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

Mr. Justice Hutchison delivered the opinion of the Court.

Eulogio Coto and Arcadio Colón were accused of killing Juan Marrero by striking him with a hammer. On arraignment each of the defendants pleaded not guilty, demanded separate trials, and moved for a bill of particulars. The refusal of this last request is assigned as error.

██ Section 71 of the Code of Criminal Procedure says that the information must contain:

"2. A statement of the acts constituting the offense, in ordinary and concise language and in such manner as to enable a person of common understanding to know what is intended."

The information herein met the requirements of this section. *People* v. *Coto,* 48 P.R.R. 143. Nevertheless, the defendant, Colón, was at the time of his arraignment entitled to a bill of particulars and the district judge erred in denying his motion.

If the evidence in the possession of the district attorney had not disclosed which of the defendants struck the blow or in what manner each of the defendants had participated in the commission of the offense, a statement to that effect might have furnished a sufficient reason for refusing Colón's request for a bill of particulars. At the trial it transpired, however, that the district attorney's theory of the case was —and must have been from the beginning—that Coto killed Marrero with a hammer provided for that purpose by Colón and that Colón was an accessory before the fact. In the circumstances, Colón, we think, was clearly entitled to a bill of particulars. In such circumstances it is no answer to a motion for a bill of particulars to say that the information meets the requirements of Section 71 of the Code of Criminal Procedure and therefore states an offense. It seems equally futile to say that the manner in which each of two co-defendants participated in the commission of an offense is a matter already within their own knowledge, unless the aphorism, that the defendant in a criminal case is presumed to be in-

nocent until his guilt has been established beyond a reasonable doubt, has become obsolete. If there be anything to the contrary in the case of *People* v. *Coto,* supra, it is to that extent hereby overruled.

In the instant case, however, the attorney for Colón also represented Coto and as the result of Coto's trial was fully informed as to the district attorney's theory of the case. The error of the district judge in overruling Colón's motion for a bill of particulars is not therefore a sufficient ground for reversal.

 The second assignment is that the district court erred in overruling a motion to strike the testimony of Ramona Ramírez, a witness for the prosecution.

Ramona Ramírez had lived for a short time with Colón. In answer to a question as to why she had left Colón, she said it was because, while asleep, he talked irrationally, threw himself out of the windows, and said that a shadow would not let him sleep. Defendant moved to strike this statement and asked the court to instruct the jury that they should not consider it. The district attorney said that it was merely a prologue to what the witness was about to say. The judge thought it would be better to let the witness finish her testimony in order to determine whether or not it was admissible. Counsel for the defense insisted that if Colón, while asleep, had made the statements attributed to him it was inadmissible, notwithstanding anything else that witness might say. In this we think counsel was right but the judge ruled that the testimony of the witness must be considered as a whole in order to determine whether or not it should be admitted. Defendant took an exception to this ruling.

The witness said that Colón had told her in the presence of one "Pocholo" that he, Colón, had given Coto the hammer with which he was to kill Marrero.

The examination then continued as follows:

"DISTRICT ATTORNEY: Tell us, what else did Arcadio Colón say to you?

"WITNESS: Well, Arcadio Colón told me, in his own house, in front of Pocholo. . . .

"JUDGE: Who?

"WITNESSS In front of Pocholo. That he had given the hammer so that Eulogio Nogueras would kill Juan Marrero.

"DISTRICT ATTORNEY: Who is Eulogio Nogueras?

"WITNESS: I think he is the one who is imprisoned, I did not know him.

"But is he Nogueras or Coto?

"I think he is either Nogueras or Coto.

"By what nickname is he known in the town?

"I cannot say. I know they call him Eulogio Coto.

"You don't know?

"I don't know. The only thing I can tell you is what he told me.

"And you say that the accused at night said—what?

"He uttered much nonsense and said that there was a white shadow beside him, and that he could not sleep, and he jumped through a window.

"DISTRICT ATTORNEY: Did you try to arouse the accused?

"WITNESS: Yes, sir.

"What did he say to you after he awoke?

"That he saw a white shadow.

"A white shadow of what?

"A dead man called . . . . I do not remember.

"That he saw the shadow of a dead man?

"Yes.

"Did he tell you the name of the dead man? If necessary you may take your time.

"Of Juan Marrero.

"When he told you that, was he awake or was he still sleeping?

"When he told me that, he was already awake, but he went to sleep again, and again he was uneasy in his bed.

"And that repeated itself?

"Yes, it repeated itself.

"Was that repeated on many nights?

"Yes, sir, it was repeated and after that I became afraid of him, and I had to go home.

"When that happened, was the accused calm or quiet?

"He was calm.

"When he told you that, was he already calm?

"Yes.

"Did you help him to fall asleep again?
"I helped him.
"And you finished by becoming afraid of him?
"That occurrence was repeated so often that I became afraid of him.
"And that happened in Coamo?
"In Coamo."

The judge overruled a motion to strike all of this testimony and said that the jury would weigh the testimony of this witness just as it would that of any other witness. It may be conceded that defendant was not entitled to have all of the testimony stricken. The district judge, however, should have granted the motion as far as any statements made by Colón while asleep were concerned, and should have instructed the jury to disregard any such statements. If the court had sustained defendant's first motion and had told the district attorney that he must confine his inquiry to statements made by Colón while awake, much of the confusion as to what was said while asleep and as to what was said while awake, might have been avoided. Not having done this, the judge should have told the jury to consider only such statements as they might find had been made by Colón while awake. *People* v. *Robinson,* 19 Cal. 41, 42; *Martínez* v. *People,* 132 Pac. 64; Ann. Cas. 1914 C, 561; 18 L.R.A. (N.S.) 788.

A more serious question arises out of a persistent effort on the part of the district attorney to get before the jury, upon one pretext or another, certain statements made by the co-defendant, Coto, after the object of the alleged conspiracy had been accomplished and therefore, after the conspiracy, if any, had come to an end. Aside from any question as to Coto's motive for making the statements, they were inadmissible as the statements of a conspirator, whatever may be said of their admissibility on other grounds. See 16 C. J. 644, section 1283; Id. 656, section 1309; Id. 659, section 1314; *People* v. *Díaz,* 22 P.R.R. 177, 194, 195.

■■■ The district attorney put Coto on the stand and after identifying him as defendant in the previous case in *People* v. *Coto* and as a witness in that case, asked him whether, before the trial of that case, he had testified in the municipality of Coamo. Defendant objected and in the course of the argument which followed, the district attorney cited *People* v. *Sierra,* 42 P.R.R. 487. Later the district attorney said that from Coto's testimony in *People* v. *Coto* he had reason to believe that Coto would be a hostile witness. The district judge after much argument said that Coto thus far had shown no hostility and for the time being sustained the objection. The district attorney asked whether he remembered having made a sworn statement before another district attorney, Rodríguez Serra. The court sustained an objection. The district attorney asked the witness whether he remembered having been summoned as a witness for the People and having testified before the district attorney, Rodríguez Serra, in a preliminary investigation of the case against Arcadio Colón and Eulogio Coto. Defendant objected and after more argument pro and con, the judge sustained the objection.

The district attorney asked Coto whether he had been accused of killing Juan Marrero. He answered: "Not I. I was accused, but I do not know what happened, I do not know." The next question was whether the witness had made a sworn statement before the district attorney, Rodríguez Serra, during the investigation of the death of Juan Marrero. The court sustained an objection. The district attorney asked whether the witness had testified at the trial in *People* v. *Coto.* He answered in the affirmative. The district attorney asked whether his testimony had been long or short. Witness answered that it has been of regular length. The district Attorney asked whether in the course of that testimony the witness had admitted or denied the statement previously made by him in Coamo before the district attorney Rodríguez Serra. The court sustained an objection. The

district attorney asked witness whether he had testified in *People* v. *Coto* concerning the participation of Arcadio Colón with witness in the death of Juan Marrero. The judge, for the time being, sustained an objection. The district attorney asked witness if he knew Arcadio Colón. Counsel admitted the fact.

In answer to other questions the witness said he had known Colón about six months; he had known Colón during a period of some four months preceding the death of Marrero; he did not remember the last time he had seen Colón before the death of Marrero; he did not remember how long it was after the death of Marrero before he saw Colón; he saw Colón after the death of Marrero; he did not remember when, but he had seen him in Coamo; it·was after the death of Marrero; he saw Colón that same day and had seen him the day before; he had seen Colón the day beroe in Colón's house in St. Thomas street where Colón had his small tavern; he saw Colón in his house, not in the small tavern, about 9 or 10:30 in the morning; he had not seen Colón in the afternoon, nor in the evening; he saw Colón the next day when Marrero had been found dead; he saw Marrero the day before his death walking in St. Thomas street; he remembered where Marrero had had his store; he knew the store well; he saw Marrero in his store; he did not see Marrero in his store the day before his death but did see him in St. Thomas street; he did not talk with Marrero at any time during that day nor during the evening; he had talked with Colón several times because he, Colón, had some live stock and sent witness on errands; he did not see Colón the day after Marrero's death; he was out of town that day; he saw Marrero's body that day; but as it was in the morning he went later into the country to buy mangoes to sell in the town as was his custom; he was at the place where the body had been found until the body was removed; he saw the removal of the body; it was late when he returned from the country and he did not see Colón during the evening; he saw Colón in

his small tavern some two days after the death of Marrero; he talked with Colón but did not remember what the conversation was about; he also talked with Colón on subsequent occasions; he did not remember when he had left Coamo; he had continued to live there; he had left Coamo some two months after the death of Marrero; he had gone to Cayey, to a place called *Rincón Sur de Cidra;* after his departure he did not again see Colón; when they brought him back to Coamo, he saw Colón again, in the police station; they brought Colón to the station after the arrival of witness; he could not say who had assisted the detective, Modesti, in finding Colón, because he was not with the detective; he did not remember who it was that pointed out Colón to the detective because he was not with Colón but in the police station; he did not remember that he had accompanied the detective, Modesti, for the purpose of pointing out Colón nor did he accompany the detective; he had not found Colón in the police station because they brought Colón some time after the arrival of witness; he had not made any sworn statement before the arrival of Colón; he did not remember having made any sworn statement in the police station; he had seen the district attorney, Rodríguez Serra, in the police station; he had not made any statement before the district attorney, Rodríguez Serra; he did not remember having signed any statement before the district attorney, Rodríguez Serra, because he did not even know how to put the number one on paper; he had not made any statement before the district attorney. The district attorney then asked leave to confront the witness with a previous statement which was said to have been made before the district attorney, Rodríguez Serra. After a preliminary statement by the district attorney who was conducting the prosecution, the judge sent the jury out and the argument went on. Counsel for defendant asked the district attorney whether he had not, during the day or the day before, questioned the witness. The district attorney replied that on the previous day he had

asked Coto whether he was going to stand by his testimony in *People* v. *Coto,* and Coto had answered that he would sustain it in part and deny it in part; that he wanted an opportunity to clarify certain parts of that testimony because it contained much truth and much falsehood.

The judge ruled that the district attorney would be permitted to confront Coto with the statement said to have been made before district attorney Rodríguez Serra, not for the purpose of proving the case of the People, but, as said in *People* v. *Méndez,* 39 P.R.R. 590, 598, "for contradicting thereby the actual testimony of the witness." The jury returned to the box and the district attorney, exhibiting a sworn statement dated August 15, 1931, asked the witness whose signature was affixed to the document. Witness answered: "I do not know whose it is, I cannot read." The district attorney asked witness if it was not his signature and he answered in the negative. The district attorney asked leave to identify the signature by another witness. Before permitting this, the judge, at the request of counsel for defendant, permitted him to cross-examine the witness as to his testimony already given. On this cross-examination witness said: he had not made any statement before the district attorney; he had made his statement in Coamo before the chief of police whose name he did not know, the secretary of the court in Coamo, whose name he did not know, and the detective called "Firpo", who had brought him to Coamo; there were other persons present whom he did not know; this statement was made in the municipal court of Coamo, not in the police station; they had brought him from a place called Rincón Sur de Cidra; they took him to the police station and began to question him; he answered their questions in the negative but there were so many people in the street listening that they took him up to the municipal court where there were only five persons; the district attorney, Rodríguez Serra, was not among the five; the first question by the chief of police was: "Tell me, Eulogio, is it true that

you and Juan Pérez and Juan Marrero were in the house of Antonia Meléndez?''; the chief of police, the secretary and the detective ''Firpo'' took his statement; Rodríguez Serra was not present at any time in the municipal court; the secretary transcribed the statement.

An omitted portion of this testimony describes what occurred on the journey from Rincón Sur de Cidra to Coamo, including brutal treatment, threats and intimidation. If this account be true, Coto's statement made in Coamo was probably involuntary.

The district attorney called Juan Gierbolini, secretary of the municipal court of Coamo, as a witness. Gierbolini identified the statement made by Coto August 15, 1931, as the one he, Gierbolini, had reduced to writing. He testified: that the chief of police had asked the questions; that the statement was subscribed and sworn to before the district attorney, Rodríguez Serra; that Rodríguez Serra was not present at the time the statement was made; that Rodríguez Serra arrived during the evening and the statement was read to Coto in the presence of Rodríguez Serra; that he—Gierbolini—read the statement and Coto reaffirmed it; that he read the statement twice because the district attorney told him to read it twice; that after the second reading, the district attorney had Coto swear to it; that Coto signed the document in his presence and the signature affixed thereto was Coto's signature. On cross-examination Gierbolini said: that the statement was made in the presence of the chief of police, José González Bermúdez; that other persons present were Pablo Murphy, marshal of the municipal court of Coamo, Leonardo Vargas, school teacher, and the detective Modesti, known as ''Firpo''; that there was no municipal judge in Coamo at the time; that the district attorney, Rodríguez Serra, was not present while the statement was being reduced to writing. On re-direct, the witness explained that the chief of police called the district attorney and the district attorney came to Coamo; that the attesting wit-

nesses signed before witness, Gierbolini, in the police station; that Coto at the time of his statement made no complaint of having been subjected to violence; that he was tranquil; that his statement was spontaneous. In answer to further questions by counsel for the defense, witness said that the questions were put to Coto by the chief of police; that witness did not remember whether "Firpo" had asked any questions; that the chief of police asked most of them; that they brought Coto from the police station to the court; that the chief of police and "Firpo" brought him.

Pedro Rodríguez Serra, assistant district attorney, testified: that he went to Coamo at the instance of the chief of police in Coamo; that he went to the police station; that the statement was twice read aloud to Coto; that he asked Coto if that was the truth about what had occurred and Coto answered in the affirmative; that he asked Coto whether anyone had threatened him or had coerced him or done violence to him or had offered him anything and Coto's answer was in the negative; that in the presence of witness Coto subscribed and swore to the statement after it had been read aloud to him twice and after he had been asked whether it was exactly what he had said and he had answered in the affirmative; that the signature affixed to the document was Coto's signature subscribed before witness; that the statement was signed in the presence of the witness and at his request; that witness saw no marks or signs of violence on Coto's face or body.

The district attorney offered in evidence the sworn statement to show that Coto had made it. After considerable argument pro and con in the presence of the jury, the judge again sent the jury out and the question as to whether the document was admissible for the purpose indicated by the district attorney under the doctrine of *People* v. *Sierra* was re-argued at length. The judge, after ascertaining that the district attorney intended to continue his examination of Coto concerning other statements that he had previously

made, reversed his ruling on the point already submitted and the jury returned to the box.

Coto again took the stand and when asked by the district attorney whether he had testified in the case of *People* v. *Coto,* counsel, after objection and some argument, admitted the fact. Coto, in answer to a question as to whether he remembered having testified in *People* v. *Coto* concerning the form and manner in which he had seen Juan Marrero on the morning when Juan Marrero was found in the Coamo gulch, witness answered in the affirmative. Asked for the names of the persons he had mentioned in his testimony in *People* v. *Coto* as the companions of Juan Marrero on the night of his death, witness answered: ''Well, I testified that he was with Arcadio Colón and Juan Pérez . . . . but that is not true.'' Asked whether he remembered where they had met Juan Marrero that evening, he answered that he did not remember. Asked whether he remembered where Juan Marrero, Arcadio Colón and Juan Pérez had met him that evening he answered that he did not remember. Asked whether he remembered where witness and others had met Juan Santiago, he answered that he did not remember. Asked if he knew Juan Santiago, he answered in the affirmative. Asked whether he had heard Juan Santiago testify in *People* v. *Coto,* he answered in the affirmative. Asked whether he had heard the testimony of Antonia Meléndez at both trials, he answered that he had heard her testify at the other trial but not at the trial of this case. Asked to state what persons, if any, gathered in the house of Antonia Meléndez on the night of the death of Juan Marrero, he answered: ''That I cannot say because I do not know what persons gathered there on that night.'' Asked whether he remembered that Juan Marrero, Arcadio Colón, Juan Pérez and he had visited the house of Antonia Meléndez that night, he answered: ''At no time.'' Asked whether he remembered that very early in the morning of the day following that on which Juan Marrero was found dead in the gulch of Coamo, he and others

had seen Antonia Meléndez, he said: "I do not remember." Asked whether he remembered how many persons he had said, in his testimony in the Coto case, where in the company of Juan Marrero that night, he answered: "I remember having testified." Asked how many persons were with Juan Marrero and who they were according to his former testimony, he answered: "I said that Arcadio Colón, Juan Pérez and I were with him, but that is not true either."

On the following day the district attorney called Manuel Rivera, who testified that Rodríguez Serra had examined Coto in detail about the contents of the statement made by him in Coamo and that Coto had signed the statement in the presence of witness and of Rodríguez Serra. When Coto again took the stand, the district attorney invoked Section 153 of the Law of Evidence and obtained, over defendant's protest, leave to ask leading questions in furtherance of justice. Asked what he knew about the death of Marrero, witness answered: that about six o'clock in the afternoon, he and others were taking some drinks in front of Marrero's small tavern; that they separated about 6:30 or 7:00; that about 9:00 o'clock he visited the house of his brother-in-law and on arrival at the house of Lino Zambrana, Juan Marrero, Juan Pérez and Pedro Pérez Zambrana were there; that he stopped at the door-way and Marrero said to him: "Ah, Yoyo, you are here, but you have not had a drink," and he answered that it did not matter; that Marrero talked with the others for a while and turned to him and said: "Take this nickel and have a drink", and he took the nickel and remained standing for a time where he was; that he then went to his house and some friend of his, Marcelo, arrived and proposed a walk about town, to which he assented; that when they passed the house of Juan Santiago, Pedro Pérez and Marrero were there and on arriving at the small coffee house of a witness named Roche, Marcelo said: "Let's go to town for a while," and witness declined saying that he was going to bed and Marcelo said: "Let's go to bed";

that Marcelo's house was beyond his and on reaching his house he went to bed and Marcelo went on; that he did not know whether Marcelo went home; that he went to bed and in the morning Pino Sosa, who lived across the street, came and said that Juan Marrero had been found dead and the brother-in-law of witness said: "Stop lying, don't tell me anyone is dead"; that they then went to the place where the body was and when they arrived there was a great crowd; that he remained there until they removed the body and then went into the country to get mangoes for the purpose of selling them, as was his custom; that the investigation went on and many persons were arrested but no one mentioned his name nor was he taken to the police station; that he remained in Coamo about two months and then told his sister that he was going to Mayagüez because there was nothing for him in Coamo and his sister offered him work and he went to her house; that some six or eight months later a friend of witness told him that two men were making inquiries concerning his whereabouts and witness went on living at the place known as Rincón Sur de Cidra; that about a month later "Firpo" appeared with a man whom witness had been told was a brother of the deceased. From this point witness continued the story substantially as told on cross-examination by counsel for defendant supra, with some additional details as for instance: that on the road from Rincón Sur de Cidra to Coamo, "Firpo" told witness that he would be beaten to death if on arrival at the police station in Coamo he did not say that he, Arcadio Colón, and Juan Pérez had killed Marrero; that he would give him tuberculosis; that witness was i nsuch fear that he answered yes to all the questions put to him by the chief of police in Coamo, but that was not true; that witness knew absolutely nothing about the crime of which he and others were accused; that he was entirely innocent.

Asked why, after having made his statement under the influence of fear before the chief of police in Coamo, when

questioned by district attorney Rodríguez Serra, without any chief of police, without any policemen, and without fear of any kind, he had answered Rodríguez Serra in the affirmative, witness said that he did not know Rodríguez Serra was a district attorney; that Rodríguez Serra told him afterwards that he was a district attorney. Asked whether he had any fear when he made his statement before Rodríguez Serra, he said that he had no fear. Asked what he had stated to Rodríguez Serra concerning what he and Arcadio Colón had done on the night when Juan Marrero met his death, he answered that he had not made any statement before the district attorney. Asked what Arcadio Colón, Juan Pérez and he had done after nightfall on the night that Marrero met his death, he answered: "I did nothing; now, I don't know about them, what they did." Asked where he had last seen Juan Pérez and Arcadio Colón on that night, he answered: "I did not see them that night." Asked as to what hour of that day was the last time he saw Arcadio Colón, he answered that he had not seen Arcadio Colón after 6:30 in the afternoon. In answer to other questions he said that the place where he had last seen Arcadio Colón was in front of the small tavern which Arcadio Colón had purchased from Marrero; that he knew Arcadio Colón had purchased the small tavern because people said he had purchased it; that he had not heard Marrero say so; that he and others had not visited the house of Antonia Meléndez between 9 and 10 o'clock nor at any time that night. Asked whether he had stated to the district attorney who was conducting the prosecution that he and others had been in the house of Antonia Meléndez on that night between 9 and 10 o'clock and that all but Juan Marrero had taken liquor, he answered: "That is according to the statement made in Coamo, I said that, but it is not true." Asked whether he remembered having testified "here in this district court" in the case against him for the murder of Juan Marrero, that he, Arcadio Colón, Juan Pérez and Juan Marrero had visited the house of Antonia

Meléndez between 9 and 10 o'clock of that night and that all
except Juan Marrero had taken rum, he answered: ''I do
not remember having said that here.'' Asked whether he
had not testified as a witness in the district court in the case
of *People* v. *Coto* that he had struck Juan Marrero with a
hammer because he was afraid of Arcadio Colón, witness an-
swered: ''Not here, in Coamo yes, but it is not true.'' Asked
whether he had testified that Arcadio Colón had proposed the
killing of Juan Marrero with a hammer, he answered: ''Here
I answered yes, that I had so stated in Coamo, but it was
not true.''

The examination, omitting objections and arguments, then
continued as follows:

''DISTRICT ATTORNEY: And do you remember, witness, that you
had declared here, in this court, in the trial of People of Puerto Rico
v. Eulogio Coto, for the death of Juan Marrero, as to the reasons
you had for refusing, at first, to strike Juan Marrero with the ham-
mer, and why you did it afterwards?

''WITNESS: I don't remember.

''D. A. And don't you remember, witness, having stated here,
in the trial of Eulogio Coto for the death of Juan Marrero, that you
refused, at first, to strike Juan Marrero because he was your friend?

''W. In my statement at Coamo, yes, I said yes, I said yes, but
it was not true.

''D. A. And don't you remember, witness, having made, in this
same district court at the trial of Eulogio Coto for the death of Juan
Marrero, a demonstration, with this district attorney who is now
speaking to you,—when you took a ruler and pointed out to the dis-
trict attorney, who had his back towards you, where you had struck
Juan Marrero with the hammer?

'' '' . . . . . . . . . .

''W. I remember that I answered him that I did not have to
take any position because I had not killed anybody.

'' '' . . . . . . . . . .

''D. A. And do you remember, witness, having testified, having
answered a question of this district attorney in the case of Eulogio
Coto for the death of Juan Marrero, to the effect that after Juan

Marrero was dead, Arcadio Colón and Juan Pérez put him in the river, took him to the river and put him in the water?

''W. I did not say that. You asked me, and I told you that in my statement at Coamo I had said that; but that it was not true.

''D. A. And who did you say put Juan Marrero in the water?

'' . . . . ⸲ . . . . .

''You asked me a question and I answered that, according to my statement at Coamo, it was so, but that my testimony at Coamo was not true.

''D. A. But when I asked you in that statement, to whom did you refer and who did you say were the persons who had put Juan Marrero in the river?

''W. I said that, I said that in my statement at Coamo.

''D. A. But to what persons did you refer, who were they?

''W. Arcadio Colón and Juan Pérez.

''D. A. And does the witness remember having answered to a question in that trial of Eulogio Coto for the death of Juan Marrero that Arcadio Colón and Juan Pérez returned afterwards with clean clothes to dress Juan Marrero?

''W. That is the statement at Coamo, that statement is not true.

''D. A. But you testified to that here also, in the court, in the trial of Eulogio Coto for the death of Juan Marrero?

''W. I did not say that. You asked me the question and I answered that,—that it was so in my statement at Coamo, but that it is not true.

''D. A. Do you remember having testified in this court in the trial of Eulogio Coto for the death of Juan Marrero that all of that happened between one and two o'clock in the morning, that night of June the 30th of 1930?

''W. I remember that you asked me the question, and that I answered that it was so, according to my statement at Coamo, but that it was not true.

''D. A. And if it was not true, why did you fix that hour in your testimony?

''W. Because the chief of police himself told me the hour, the chief of police of Coamo.

''D. A. And you answered in accordance with what the chief of police told you?

''W. According to what the chief of police told me.

''D. A. And when District Attorney Rodríguez Serra saw you afterwards, and you had nothing else to do with the chief, and he

asked you at what time that had happened, why did you fix that same hour?

"W. But I did not mention any specific time to the district attorney.

"D. A. You did not mention any time? And did not District Attorney Rodríguez Serra ask you personally as to all the testimony you had given?

" . . . . . . . . . .

"W. He did not ask me anything. He read it to me.

"D. A. Did he read it to you?

"W. Yes.

"D. A. Then you remember that District Attorney Rodríguez Serra read that statement to you?

"W. Of course I remember.

"D. A. And do you remember that you signed that statement?

"W. I do not remember that.

"D. A. And do you remember having said to this district attorney in the case of Eulogio Coto for the death of Juan Marrero that when the blow was struck on the head of Juan Marrero his back was toward you?

"W. In accordance with my statement at Coamo, you asked me that question, and I answered in the affirmative, but it was not true.

"D. A. That is all.

"JUDGE: The defense may interrogate the witness.

"D. A. I wish to state that all the testimony which I have read to the witness, has been read and the questions have been asked as to this previous testimony, with the purpose of contradicting this witness, because of his attitude in the direct examination, and with the permission given the district attorney by the court in accordance with Section 153 of the Law of Evidence, and the precedent established by *People* v. *Méndez,* volume 39, page 590.

"JUDGE: So it is stated. The defendant may begin his cross-examination."

The statement of the district attorney at the close of the direct examination must be construed as referring to that part of the examination which immediately preceded such statement. The examination of this witness occupied the time and attention of the court and the jury during something less than two days of the trial. It covers some two-hundred pages of the stenographic record. From the begin-

ning until near the close of the direct examination it involved a more or less continuous effort on the part of the district attorney to get before the jury previous statements of the witness, not for the purpose of contradicting his testimony at the trial of the instant case, but as the statement of a conspirator made after the conspiracy had come to an end. It was during the second day of the examination, after the district attorney had requested and obtained leave of the court to ask leading questions, and shortly before the close of the direct examination that the following incident occurred:

"DISTRICT ATTORNEY: And in this very same district court, at the trial of the People of Puerto Rico against yourself, what did you state to this district attorney who is now interrogating you, as to what you had done under requests of Arcadio Colón?

"DEFENSE: We object, Your Honor. We object because we are not investigating today the case against Eulogio Coto; we are investigating the case of Arcadio Colón, and anything Eulogio Coto may have said at that time has nothing to do with the case we are investigating today, this being a witness of The People of Puerto Rico who must answer solely and exclusively what he knows and not what he answered that day, and because the district attorney is not asking these questions in order to contradict the witness under Sections 243 and 243 (sic) of the Code of Criminal Procedure of Puerto Rico.

"DISTRICT ATTORNEY: I am interrogating under Section 153 of the Law of Evidence.

"JUDGE: What the defendant says is that the district attorney is not interrogating the witness so as to contradict him. Is this the question, or not?

"DISTRICT ATTORNEY: The district attorney is not interrogating him so as to contradict him. The district attorney is interrogating him under Section 153 of the Law of Evidence, asking him what he knows of his own knowledge, and what he has testified to, as co-author of this same crime, in a separate trial of The People of Puerto Rico against Eulogio Coto, Eulogio Coto being the person who appears in the information against Eulogio Coto and Arcadio Colón, the same person who is testifying today as a witness, and Arcadio Colón, who is mentioned in the information, being the accused, who is sitting today in the defendant's seat.

"DEFENSE: Section 153 of the Law of Evidence, as decided by Your Honor in favor of the district attorney, is to the effect that he may ask leading questions. A leading question is one thing and whether the question is admissible even if it is a leading question is another thing. I shall always object to the leading questions even if the court admits them under its ruling so as to take an exception. It is another thing as to whether the question, even if leading, is admissible.

"DISTRICT ATTORNEY: It is admissible, under the cases and the authorities cited by the district attorney, so that any declaration made by an accessory or so co-accused relating to facts common to him and to the other co-accused, especially of the accessory who was accused jointly with him, and tried separately, constitute admissible evidence.

"JUDGE: We are discussing the same question which was discussed and decided yesterday, or rather, which has not as yet been decided,—which has been partially decided. Section 153 refers to leading questions, but the court does not refer to that section. It refers to Section 156 of the Law of Evidence and Section 243 of the Code of Criminal Procedure. That is the section which is most applicable.

"D. A. But that refers to contradictions. I am not contradicting.

"JUDGE: And it says: The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony. (Section 243 of the Code of Criminal Procedure.)

"That is all which can be done under that section, as explained and clerified by the Supreme Court in the case of *People of Puerto Rico* v. *Méndez,* 39 P.R.R. 590. So, that is what can be done. If it is not for that purpose, then the court upholds the objection of the defendant.

"D. A. May it please the court. We are going to clarify the difference which exists between the two points, in the opinion of the district attorney. The district attorney is putting leading questions to the witness under the previous authorization of the court, and under Section 153 of the Law of Evidence. The question which has just been asked the witness, has not been asked with the purpose of contradicting him nor of showing what he may have declared previously,—which may have been inconsistent with what he declares today,—but it has been made simply for the purpose of determining

what he knows about the case, and as to which he has testified in this very same court, at the trial of People of Puerto Rico against himself, as co-accused with Arcadio Colón, and as a co-author of the crime of murder for the death of Juan Marrero. And the question is, as understood by the district attorney, none other than whether it may be permitted, whether it is permissible under the law to ask the co-accused, who has already had a separate trial, leading questions, it being the opinion of the district attorney in this case that it is a right of The People, in a separate trial against Arcadio Colón, to ask Eulogio Coto, as a co-author who has already been convicted, as to everything which he may have testified to, as a co-author of that same crime for which Arcadio Colón is being prosecuted, and which is within his personal knowledge.

"JUDGE: That question was discussed very extensively yesterday.

"DEFENDANT: Will the court allow me? That has been decided by the court. I thought the district attorney was setting forth the grounds of his objection; what he has requested is a reconsideration, so that the court may change its mind. I was under the impression that the district attorney was setting forth the grounds of an objection to the ruling of Your Honor. What he has requested is a reconsideration of the ruling of Your Honor.

"JUDGE: We are accumulating discussions unnecessarily.

"DEFENDANT: What he said appears from the stenographic record. He should have asked for a reconsideration, formally, but he began to argue.

"JUDGE: No. The court is not going to reconsider nor do anything. What the court says is that what was said forty or fifty times yesterday is being repeated now; the witness is testifying since yesterday, and, naturally, this same question comes up again. Give me volume 39, to repeat again, literally, what the Supreme Court has said, that is the only thing. Page 590. This is a witness of the district attorney, is he not? Is that so?

"D. A. Yes, sir.

"JUDGE: Is that correct?

"D. A. Yes, sir.

"JUDGE: Under Section 243 of the Code of Criminal Procedure: 'The party producing a witness is not allowed to impeach his credit by evidence of bad character, but he may contradict him by other evidence, and may also show that he has made at other times statements inconsistent with his present testimony.' And in the case of People v. Méndez, it is said, referring to this kind of evidence and

to these situations, that the district attorney may have a witness whom he brings to testify, expecting him to testify in a certain manner, but who does not testify in that manner, the witness falling then within the provisions of the section of the Code of Criminal Procedure which we have already cited. 'That the district attorney has the right, in that case, to be given an opportunity to offer this evidence, not for the purpose of proving his case with it, but to contradict with it the actual testimony of the witness.'

"They are two completely different things. That is why the court asked the district attorney whether or not the purpose of that question was to contradict the testimony of the witness. And the court means to say that if the purpose of the question were to contradict the witness, by offering other evidence, the court could admit the question, but inasmuch as the district attorney said that that was not the purpose of the question, that is why the court sustained the objection."

This discussion, like much of the argument arising from similar attempts of the district attorney during the examination of this witness, was in the presence of the jury. The natural tendency of so much ado about what Coto had said as a witness while on trial for the murder of Juan Marrero or in his sworn statement during the previous investigation in Coamo was to divert the attention of the jury from the main issue and to create an impression that the question as to whether Coto had spoken the truth on previous occasions was a pivotal point in the case.

At the close of Coto's testimony, the judge mentioned the fact that Coto's sworn statement offered by the district attorney on the previous day had not been admitted. The district attorney said that he would not insist upon the admission of the document. The judge asked if the district attorney meant that he would withdraw it and he answered in the affirmative. There never had been any question as to whether Coto had made the statement. At the time the document was offered in evidence the question was whether Coto had subscribed the same in the presence of the district attorney. The only question was as to the genuineness of the signature or as to whether Coto had signed the document

in the presence of the district attorney. The contents of the document had no bearing upon this point. The jurat would have added little or nothing to the evidence already before the court.

Neither the sworn statement made by Coto in answer to questions put by the district chief of police in the presence of "Firpo" and others nor the stenographic record of Coto's testimony at his own trial are before us. It is a fair inference that the testimony, whatever it was, had been elicited by the district attorney from an unwilling witness on cross-examination.

The district attorney, as we have already shown, shortly after putting Coto on the stand in the instant case, frankly stated that from Coto's testimony in *People* v. *Coto,* he had reason to believe that Coto would be a hostile witness. The district attorney had also been informed by Coto himself that his testimony in the Colón case would not be as favorable to the prosecution as it had been at the trial of his own case. Nevertheless, if the district attorney honestly believed that Coto had told the truth in the sworn statement made in answer to questions put by the district chief of police in the presence of "Firpo" and others, there was no reason why he should not have put Coto on the stand for the purpose. of questioning him as he would have done in the case of any other witness for the prosecution in a conscientious effort to obtain from him a re-statement of his previous testimony in whole or in part.

Section 243 of the Code of Criminal Procedure and Section 156 of the Law of Evidence (now Section 518 of the Code of Civil Procedure, 1933 ed.) are salutary provisions designed to aid the court in arriving at the truth. They should not be frittered away by making "surprise" a condition precedent to the impeachment of one's own witness. It might even be argued upon excellent authority that, inasmuch as Coto himself was present and subject to cross-examination as to his own previous statements, those statements were

not obnoxious to the hearsay rule. See 2 Wigmore (2d ed.) 459–460, Section 1018, paragraph (*b*). If, however, we are to adhere to the rule established in *People* v. *Rojas,* 16 P.R.R. 238, and a series of subsequent cases, the judgment of the district court cannot be sustained. See *People* v. *Colón,* 25 P.R.R. 586; *People* v. *Ramírez de Arellano,* 25 P.R.R. 243; *People* v. *Rodríguez Hernández,* 36 P.R.R. 388; *People* v. *Plata,* 36 P.R.R. 530; *People* v. *Lafontaine,* 43 P.R.R. 21; *People* v. *Busigó,* decided June 25, 1937, No. 6524. (51 D.P.R. 955).

The district attorney did not put Coto on the stand for the purpose of showing by his direct testimony that Colón had instigated the murder. It was the avowed purpose of the district attorney to introduce as independent, substantive evidence Coto's previous statements. It was under the compulsion of adverse rulings that he finally asked a few questions by way of laying the foundation for the impeachment of his own witness. In the meanwhile, he had probably made a stronger impression on the jury than he would have made if Coto's previous statements had been admitted at the outset. The admissibility of these statements for the purpose of contradicting Coto's direct testimony in the instant case need not be questioned.

The judge, after charging the jury, added, at the request of defendant's attorney, a special instruction to the effect that the jury should take into consideration only the evidence "presented" during the four days of the trial and should not consider for any purpose evidence that had been presented elsewhere or anything that any witness might have said elsewhere. The fact remains that the jury may have been unduly influenced in the consideration of its verdict by the district attorney's protracted struggle over the proposed introduction of Coto's previous statements as independent, substantive testimony, notwithstanding the fact that the district judge gave the special instruction requested by defendant's attorney and notwithstanding the further fact that

Coto's admission during the trial of the instant case were properly admitted for the purpose of contradicting him.

The evidence for the prosecution, aside from the long controversy over Coto's previous statements and admissions, is not so conclusive as to make it improbable that the jury was unduly influenced by that controversy. That evidence— except the testimony of Ramona Ramírez as to the statement which she says Colón made in the presence of "Pocholo"— was entirely circumstancial. There was a stipulation that if Pocholo were called as a witness for the defense he would testify that Colón had not made any such statement in his presence. Antonia Meléndez testified that on the night of the death of Marrero, Colón, Marrero, Coto and Juan Pérez were at her house between 8 and 9 o'clock or shortly before 9. That about 6:00 a. m. the next day, Colón, Coto and Pérez again passed her house without Marrero and in answer to a question as to where they had left Marrero, said that they had lef him asleep. Colón's attorney testified that Antonia Meléndez had told him that her statement made before the District Attorney was false. There was testimony tending to show that Colón, Coto, Pérez, Marrero and another or others were together in Colón's small tavern between 7:30 and 8:00 o'clock; but Colón established a strong alibi which covered the time intervening between 5:00 o'clock in the afternoon and about 9:00 o'clock or later in the evening. Coto's brother-in-law testified that Colón, while under the influence of liquor, told Coto that he must go to Cayey "because if you uncover this case we two will settle the matter later." There may be some other testimony worth mentioning. We have not re-read the stenographic record in order to refresh our memory on this point. There was no satisfactory evidence of motive. It may be conceded that if the jury believed the testimony of Ramona Ramírez of Antonia Meléndez and of Coto's brother-in-law, their testimony might be deemed sufficient to support the verdict. It fails to satisfy us that the jury would have rendered the same verdict

if so much stress had not been laid on Coto's previous statements and admissions.

We are unable to escape the conclusion that the jury may have based its judgment in part upon Coto's sworn statement made before the district chief of police and in the presence of "Firpo" or upon Coto's testimony at his own trial or upon both.

The judgment appealed from must be reversed and the case will be remanded for further proceedings not inconsistent herewith.

Mr. Chief Justice Del Toro and Mr. Justice Córdova Dávila took no part in the decision of this case.